MANCIK v RACING COMMISSIONER

Docket No. 200882. Submitted December 8, 1998, at Detroit. Decided June 25, 1999, at 9:40 A.M. Leave to appeal sought.

Richard J. Mancik appealed to the Wayne Circuit Court the revocation of his pari-mutuel horse-racing license by the Michigan Racing Commissioner. The revocation was based on evidence that he possessed illegal injectable drugs and hypodermic needles and syringes at his stables and that he failed to cooperate in the inspection of three horses by representatives from the commissioner's office that led to the discovery of the drugs and hypodermic needles and syringes a day or two before the horses were scheduled to participate in races. The court, Jeanne Stempien, J., reinstated Mancik's license, ruling that the inspection of the horses and their tack was unconstitutional because it exceeded the scope of Mancik's oral consent and was not within the scope of MCL 431.71(3); MSA 18.996(41)(3), which required licensees to consent to inspections of premises and property as part of the annual renewal of their licenses. The Michigan Racing Commissioner, the Michigan Racing Commission, and the Michigan Department of Agriculture appealed by leave granted.

The Court of Appeals *held*:

1. MCL 431.71(3)(a); MSA 18.996(41)(3)(a) provides that an applicant for an occupational license shall consent upon application and for the duration of the license to, among other things, inspections of premises and property related to the applicant's participation in a race meeting by persons authorized by the racing commissioner. The trial court erred in determining that such statutory consent is limited to searches conducted on the grounds of racetracks. The statute plainly indicates that the premises subject to consensual searches encompass all areas connected to a race meeting, including those found off-track.

2. The trial court erred in determining that the inspection that was conducted exceeded the scope of Mancik's oral consent. A reasonable person would believe that Mancik's consent to the inspection of the horses and their tack included consent for a search of the barn and areas within it that might have held the tack.

Circuit court order vacated; racing commissioner's decision reinstated.

1. SEARCHES AND SEIZURES — MICHIGAN RACING COMMISSIONER — OCCUPATIONAL LICENSEES — CONSENT TO INSPECTIONS.

A person applying for an occupational license from the Michigan Racing Commissioner, or a renewal thereof, consents upon application and for the duration of the license to inspections of premises and property related to the applicant's participation in a race meeting by persons authorized by the racing commissioner; premises subject to inspection encompass all areas connected to a race meeting, including those found off-track (MCL 431.71[3][a]; MSA 18.996[41][3][a], now MCL 431.316[4][a]; MSA 18.996[316][4][a]).

2. SEARCHES AND SEIZURES — CONSENT — OBJECTIVE REASONABLENESS.

The standard for measuring the scope of a person's consent under the Fourth Amendment is that of objective reasonableness.

Ronald J. Mancik, in propria persona.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Donald S. McGehee* and *Keith D. Roberts*, Assistant Attorneys General, for the respondents.

Before: HOLBROOK, JR., P.J., and O'CONNELL and WHITBECK, JJ.

PER CURIAM. Respondents appeal by leave from an order of the circuit court that reversed respondent Michigan Racing Commissioner's decision to revoke petitioner's pari-mutuel horse-racing license. We vacate the circuit court order and reinstate the commissioner's decision.

I. BACKGROUND FACTS AND PROCEDURAL HISTORY

From 1978 to 1993, petitioner held an occupational license to participate in pari-mutuel harness racing as an owner, trainer, and driver of standardbred racehorses. Petitioner's license was reissued by the com-

missioner annually. For the last twelve years of this
fifteen-year period, petitioner operated a business
called the "Rick Mancik Racing Stables." On August 1,
1993, a standardbred racehorse known as "Classic
Legend"—one of the horses stabled and trained at
petitioner's place of business—won a harness race
run at Saginaw Harness Raceway. At the time, peti-
tioner's father was named as the horse's trainer.

A routine postrace urine test of Classic Legend
revealed the presence of the prohibited drug
Etorphine. As a result, the occupational trainer's
license of petitioner's father was summarily sus-
pended. Thereafter, petitioner replaced his father as
the trainer of record for at least three other horses
similarly stabled and trained at petitioner's place of
business. Those three horses—"Cadre," "S F Demon,"
and "Sad to See You"—were scheduled to race at
Hazel Park Harness Raceway on August 13 and 14,
1993. On August 12, 1993, representatives from the
commissioner's office arrived at petitioner's place of
business and proceeded to search a barn located on
the property. This search turned up several unautho-
rized and illegal drugs, as well as a number of hypo-
dermic needles and syringes.

In a Stewards' Ruling dated August 13, 1993, peti-
tioner's occupational license was suspended. In their
ruling, the stewards found that on August 12, 1993,
petitioner (1) was in possession of illegal injectable
drugs and related hypodermic paraphernalia, and (2)
had failed to cooperate as required in the inspection
of Cadre, S F Demon, and Sad To See You. Following
a contested-case appeal de novo, the designated hear-
ing officer concluded that the stewards' finding with
respect to the drugs should be upheld, but the failure

to cooperate charge should be dismissed. The hearing officer recommended a one-year suspension of license and a $1,000 fine. Subsequently, the commissioner concluded that both charges were supported by the evidence. The commissioner then indefinitely revoked petitioner's license effective August 13, 1993, and excluded petitioner "from the grounds of all licensed race meeting in this state . . . through November 30, 1994." On appeal, the circuit court found that the search was unconstitutional, and thus it excluded the evidence obtained. The circuit court then dismissed the possession charge and, observing that petitioner was under no obligation to consent to an illegal search, dismissed the failure to cooperate charge as well. Finally, the court reinstated petitioner's license.

II. REVIEW OF CIRCUIT COURT HOLDING: THE ISSUE OF CONSENT

[W]hen reviewing a lower court's review of agency action this Court must determine whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings. This latter standard is indistinguishable from the clearly erroneous standard of review . . . . [A] finding is clearly erroneous when, on review of the whole record, this Court is left with the definite and firm conviction that a mistake has been made. [*Boyd v Civil Service Comm*, 220 Mich App 226, 234-235; 559 NW2d 342 (1996).]

After reviewing the circuit court's opinion, we conclude that the court committed several legal errors when it examined the issue whether petitioner had consented to the search of the barn.

The circuit court began its examination by correctly noting that in order for a consensual search to be valid, the consent must be voluntary. *Schneckloth v Bustamonte*, 412 US 218, 248-249; 93 S Ct 2041; 36 L Ed 2d 854 (1973). However, although the court indicated that it was then going to examine whether petitioner's consent was voluntarily given when he filled out and signed his occupational license application each year, the record reveals that the court then veered off into an examination of the scope of the alleged consensual search. Accordingly, the court never examined whether, given the totality of the circumstances, petitioner voluntarily consented to a search of his place of business when he filled out the license applications. *Id.* at 249; *People v Marsack*, 231 Mich App 364, 378; 586 NW2d 234 (1998).

We also believe that the circuit court erred in its examination of the scope of the consensual search. The application form petitioner filled out each year he applied for his occupational license included the following provision:

> I expressly agree to be subject to the subpoena powers of the Michigan Racing Commissioner or a written request issued in lieu of a subpoena and to provide the Commissioner with any and all such information or documents which the Commissioner may so request. . . . I further consent to be subject to the searches provided for in [MCL 431.71(3); MSA 18.966(41)(3)] that authorizes personal inspections, including urine and breathalyzer tests, inspections of any personal property, and inspections of premises and property related to my participation in a race meeting by persons authorized by the Racing Commissioner.

The circuit court looked at the language of MCL 431.71(3); MSA 18.966(41)(3) and concluded that the

scope of any consensual search authorized by the statute was limited to the racetrack grounds. We disagree with this conclusion.

MCL 431.71(3); MSA 18.966(41)(3), which was subsection 11(3) of the Racing Law of 1980,[1] read in pertinent part:

In addition to the requirements of subsection (2), an applicant for an occupational license shall consent upon application and for the duration of the occupational license, if issued, to all of the following:

(a) Personal inspections, inspections of the applicant's personal property, *and inspections of premises and property related to his or her participation in a race meeting by persons authorized by the racing commissioner.* [Emphasis added.]

The plain and unambiguous language of subsection 11(3)(a) indicated that the scope of a consensual search of premises was not limited to the racetrack itself. Rather, the scope included those areas "related to" the licensee's "participation in a race meeting."[2] Such areas routinely include off-track facilities like petitioner's business. While it is true that other subsections of MCL 431.71; MSA 18.966(41) specifically and implicitly refer to the racetrack, this does not mean that subsection 11(3)(a) is similarly limited. Indeed, the fact that subsection 11(3)(a) does not include either an explicit or implicit reference to the

---

[1] MCL 431.71; MSA 18.966(41) was repealed by 1995 PA 279, effective January 9, 1996 (after the events pertinent to this case). Substantially similar provisions are included in the House Racing Law of 1995, MCL 431.316; MSA 18.966(316).

[2] "Race" is defined as "a contest of speed among horses for a prize." 1985 AACS R 431.1020(a). "Meeting" is defined as "the entire period of consecutive days which is granted by the commissioner to an association for the conduct of racing." 1985 AACS R 431.1010(h).

racetrack should be seen as a clear indication that the Legislature intended not to so limit its application. See *Farrington v Total Petroleum, Inc*, 442 Mich 201, 210; 501 NW2d 76 (1993).

The circuit court also concluded that its reading of the scope afforded by subsection 11(3)(a) was supported by 1985 AACS R 431.4020(1)(b), which indicates that stewards have the duty and responsibility to "[i]nvestigate any act of cruelty seen by them or reported to them, whether a horse subjected .to the alleged cruelty is stabled on or off association[3] grounds." Rule 431.4020(1)(b). Although the court did not specifically so state, we believe that the circuit court focused on this rule because it believed the language of the rule exemplified a presumption that was central to the court's opinion: namely, if the Legislature had meant to include off-track sites in the scope of a consensual search conducted pursuant to subsection 11(3)(a), it would have explicitly provided for that in the statute.

We are unpersuaded. As previously mentioned, we believe subsection 11(3)(a) plainly indicates that the premises subject to search encompasses all areas connected to a race meeting, including those found off-track. Further, given the circumstances of this case, we find the following regulatory language to be more persuasive with regard to the issue of scope:

> A person on the grounds of a racetrack under the jurisdiction of the commissioner *or on grounds where horses which are eligible to race at the racetrack are kept* shall not have any of the following in his or her possession, in his or

---

[3] "Association" is defined as "a legal entity licensed by the commissioner to conduct a race meeting." 1985 AACS R 431.1001(d).

her personal effects or vehicle, *or in or upon premises he or she occupies or controls:*

  (a) A hypodermic syringe.

  (b) Hypodermic needle.

  (c) Other hypodermic device.

  (d) A drug used for the injection or infusion of another drug into a horse. [1985 AACS, R 431.1135(1)  (emphasis added).]

Finally, we also believe that the circuit court erred when it examined the scope of the consensual search agreed to verbally by petitioner on August 12, 1993. Earlier in its opinion, the circuit court found that the officials who conducted the search had asked for permission to examine the three horses and their related tack. Later, the court also found that "[t]here is no disputed fact that [petitioner] did not agree to the search of closets, cabinets, and the interior of the barn at the time of the inspection." We believe that this finding was based on an improper focus on petitioner's subjective intentions.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Florida v Jimeno*, 500 US 248, 251; 111 S Ct 1801; 114 L Ed 2d 297 (1991). The question thus presented is whether a reasonable person would believe that petitioner's consent to search the horses and their related tack included consent to search the barn and areas within it that might be able to hold the tack. We conclude that such a belief is objectively reasonable. Petitioner placed no express limitation on the scope of the searchers' examination of the tack. For example, he

did not say that they could examine any tack in plain view, but were not allowed to look in unlocked containers inside the barn where such items would normally be found. Further, given that a few days earlier one of the horses trained and stabled at petitioner's place of business had tested positive for an unapproved drug, we believe a reasonable person would have understood that those searching the horses and their tack would be looking for other illegal drugs and hypodermic paraphernalia. Under these circumstances, we believe that a reasonable person would conclude that the person had the right to search containers inside the barn. *Id.*

Even though the circuit court committed the above noted legal errors, we do not find it necessary to remand to the circuit court for further proceedings. Applying the proper principles of law to the record before us, we conclude that petitioner voluntarily consented both verbally and in his license application to the search conducted. Therefore, we hold that the order of the lower court is vacated, and the decision of the commissioner is reinstated.[4]

---

[4] Because the issue of consent is dispositive, we need not address the constitutional challenges posed by petitioner. *Detroit v Sledge*, 223 Mich App 43, 47; 565 NW2d 690 (1997).